Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4704 | **DATE** | 8/7/2000 |
| **CASE TITLE** | Fyrnetics vs. Quantum Group, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the Court grants defendant's motion to dismiss or stay pending arbitration. Under the License Agreement, arbitration must take place in San Diego, California if initiated by Quantum. Confirmation of the award will take place, if at all, in a state or federal court in San Diego. Thus rather than staying this action pending completion of the arbitration, the Court hereby dismisses plaintiffs' complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 10 2000 | |
| | Notified counsel by telephone. | | date docketed | 34 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 00 AUG -9 PM 5:58 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FYRNETICS (HONG KONG) LIMITED and WALTER KIDDE PORTABLE EQUIPMENT, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> QUANTUM GROUP, INC., <br><br> Defendant. | Case No. 99 C 4704 <br><br> DOCKETED <br><br> AUG 1 0 2000 |

MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On July 27, 2000, the Court held an evidentiary hearing to assist in determining whether the dispute that gave rise to this action is subject to mandatory arbitration provisions contained in either or both of two contracts. For the reasons that follow, the Court concludes that the parties' dispute is in fact subject to arbitration.

A. The dispute

In 1997, plaintiff Fyrnetics (Hong Kong) Limited ("FHK") purchased carbon monoxide ("CO") sensors made by defendant Quantum Group, Inc. and installed them in CO detectors that FHK manufactured. FHK sold the finished CO detectors to plaintiff Walter Kidde Portable Equipment, Inc. ("Kidde"), a sister company that marketed the detectors in the United States. According to plaintiffs, Quantum knew that the labels placed on FHK's CO detectors contained ammonia which could impair or disable Quantum's CO sensor, a vital component of the CO detector. Quantum advised FHK that it had tested two methods for protecting the sensor from

ammonia contamination – a "getter bag" and a felt shock absorber – and that both did the job equally well. Quantum did not have enough of either item to use in all the CO detectors, so FHK purchased some of both and installed them in the CO detectors.

FHK later learned that certain Quantum sensors it had purchased for CO detectors that it made between June 1997 and January 1998 had failed, causing the CO detectors to malfunction. It determined that the detectors with the getter bags performed as expected, but those with the shock absorbers did not work properly. But because (FHK says) Quantum had represented that both methods worked equally well, FHK had not marked its CO detectors to identify which had getter bags and which had shock absorbers. Thus it had to recall all of the CO detectors, some 450,000 altogether. Plaintiffs say this cost them over $14 million. They filed this lawsuit to recover these and other damages.

**B.    Quantum's motion to dismiss or stay pending arbitration**

Quantum moved to dismiss or stay the case, arguing that plaintiffs' claims are subject to mandatory arbitration provisions contained in two contracts: a Manufacturing Agreement between Quantum and FHK, and a License Agreement between Quantum and Fyrnetics, Inc. Based on the materials submitted by the parties, the Court determined on January 24, 2000 that an evidentiary hearing was necessary for determination of Quantum's motion. *See* 9 U.S.C. §4. Both parties waived a jury, and after conducting discovery focused on the issue of arbitrability, they agreed to present one witness per side with time limits on those witnesses' testimony. The hearing was held on July 28, 2000.

**C.    Facts**

FHK is a Hong Kong corporation; since January 24, 1997 its stock has been owned by

2

Williams Holding (International) Ltd., a subsidiary of Williams PLC. Cplt. ¶1; DX 3. Fyrnetics Inc. ("Fyrnetics") was an Illinois corporation. In late January or early February 1997, Kidde, a subsidiary of Williams PLC, purchased Fyrnetics' stock. Cplt. ¶3; Russo Aff. ¶3. In June 1998 (after Quantum's sales of the allegedly defective CO sensors), Fyrnetics was merged into Kidde and was formally dissolved. Cplt. ¶3; Russo Aff. ¶3. In the remainder of this decision, we will refer to Fyrnetics after the 1997 acquisition as Fyrnetics/Kidde, to distinguish it from the corporation as it existed prior to the acquisition.

In June 1996, Quantum and FHK entered into a Manufacturing Agreement. In this Agreement, FHK agreed to manufacture CO detectors for sale by Quantum; Quantum agreed to supply FHK with CO sensors and other components to be used in the CO detectors. Mfg. Agr., ¶2. The Agreement provided that neither party could assign or subcontract work under the Agreement without the other party's written consent. *Id.*, ¶24.A. The Agreement also provided that it could not be assigned "except in its entirety by FHK, Ltd. as a part of the sale of FHK, Ltd.'s entire business . . . upon prior written notice to [Quantum], and then only if the assignee agrees in writing to be bound by the terms here of [sic] as if named herein in place of FHK, Ltd." *Id.*, ¶24.B. It also provided that "[n]o amendment or modification of this Agreement shall be valid or binding upon the parties unless made in writing and executed on behalf of each of such parties by their respective duly authorized representative thereunto." *Id.*, ¶28.B. The Agreement further provided that it was to be governed by Illinois law, and that "[a]ny claim or controversy arising between the parties hereto in connection with this Agreement, or with a breach thereof . . ., shall be determined by arbitration in accordance with the rules of the American Arbitration Association . . . ." *Id.*, ¶33. If initiated by FHK, the arbitration would be held in San Diego,

3

California; if initiated by Quantum, it would be held in Chicago. *Id.*, ¶34.

Quantum and Fyrnetics entered into a License Agreement in June 1996. In this Agreement, Quantum granted Fyrnetics a non-exclusive license, effective January 1, 1997, to make and sell for its own account CO detectors equipped with Quantum's CO sensors. Lic. Agr., ¶I.A.(1). The Agreement permitted Fyrnetics to sublicense its affiliates, defined as entities which controlled or were controlled by Fyrnetics or had ownership common to Fyrnetics. *Id.*, ¶¶I.A.(2); *see also id.*, p. 3 (definition of "affiliate"). The Agreement required Fyrnetics to pay Quantum a royalty consisting of 2.5% of the gross sales of CO detectors pursuant to the Agreement, with a minimum payment owed by Fyrnetics whether or not sales were sufficient to generate royalties in that amount. *Id.*, ¶II.A. & B. The Agreement precluded Fyrnetics from subcontracting any work involving Quantum's proprietary information (i.e., the sensors) without first entering into a written nondisclosure agreement with the subcontractor. *Id.*, ¶III.J.(7). The Agreement provided that it was to be governed by California law, *id.*, ¶III.K.(15), and it contained a provision requiring arbitration of "[a]ny claim or controversy arising between the parties hereto in connection with this Agreement, or with a claimed breach thereof . . . ." *Id.*, ¶III.H. As was the case under the Manufacturing Agreement, if initiated by Quantum arbitration was to take place in Chicago, and if initiated by Fyrnetics it was to take place in San Diego. *Id.* The License Agreement also provided that it "may not be assigned except in its entirety by [Fyrnetics] as a part of a sale of [Fyrnetics'] entire business . . . upon prior written notice to Quantum, and then only if the assignee agrees in writing to be bound by the terms hereof as if named herein in place of [Fyrnetics]." *Id.*, ¶III.K.(10).

Thomas Russo, who was president and CEO of Fyrnetics and Fyrnetics/Kidde and was

4

also managing director of FHK during the relevant periods, and who is now a vice president of Kidde, testified at the hearing. He stated that FHK made CO detectors for Quantum under the Manufacturing Agreement at a plant in China. Russo testified that in late 1996, he became concerned that FHK's manufacture of the CO detectors for Quantum did not provide the plant with sufficient volume, and he proposed to Quantum's president Mark Goldstein to increase the plant's volume by having FHK also make CO detectors for Fyrnetics. Russo stated that Goldstein eventually agreed to this and that several months later, in 1997, FHK started making CO detectors for Fyrnetics (by then, Fyrnetics/Kidde). Russo testified that at the time of his verbal agreement with Goldstein, he and Goldstein agreed that FHK would pay Quantum a 2.5% royalty on sales of CO detectors to Fyrnetics/Kidde, as this was the royalty rate that Quantum charged to other manufacturers, some of whom had "most favored nations" clauses in their agreements.

The allegedly defective detectors supplied by Quantum were used by FHK in the CO detectors it was making for Fyrnetics/Kidde. Russo said that he understood that in connection with these activities, FHK and Quantum were operating under a verbal agreement, not either the Manufacturing Agreement or the Licensing Agreement. Indeed, he testified, the Licensing Agreement was never used, as Fyrnetics/Kidde never purchased CO sensors from Quantum and never made any CO detectors for its own account (as that Agreement contemplated) and never sublicensed any other entity to do so. However, on cross examination, Russo conceded that in May 1997, Fyrnetics/Kidde issued purchase orders to Quantum for sensors and other components for both the detectors being manufactured for Quantum and those being manufactured for Fyrnetics/Kidde. DX 24; *see* PX 21. Some of the sensors were actually shipped pursuant to the

5

purchase orders, *see* PX 21, pp. FHK001496 & FHK 001504; it is not clear whether these included any of the allegedly defective sensors. In September 1997, Fyrnetics/Kidde canceled "the balance of what is open" on the purchase orders and said that FHK itself would place orders itself for the remainder. According to Russo, Fyrnetics/Kidde had placed the orders on FHK's behalf because some of its personnel wanted to make it easier for FHK (whose principal offices were in Hong Kong) to communicate with Quantum; he says this was a mistake which he corrected once he learned it had occurred.

Though Russo maintained that the License Agreement had never been used and was essentially a dead letter, he conceded that it was never terminated. And in January 1997, Russo received copies of correspondence between the attorneys for Fyrnetics and Quantum discussing the assignment of that Agreement in connection with the impending sale of Fyrnetics to Kidde. Russo understood this correspondence as meaning that it was unnecessary to make a written assignment of the License Agreement. *See* DX 8, DX 9. In addition, the agreements documenting Kidde's purchase of Fyrnetics indicated that the "Quantum licence" – the License Agreement – was being transferred to Kidde as part of the sale. *See* DX 4, p. 12; *see also* DX 3, Sched. 8, ¶24.2. And other correspondence dated later in 1997 referred to the License Agreement as if it was still in effect. *See* DX 11.

Quantum's president Mark Goldstein, who also testified at the hearing, agreed that he had allowed FHK to make CO detectors for Fyrnetics using Quantum's sensors, but said he believed that this was being done pursuant to the License Agreement and the Manufacturing Agreement.[1]

---

[1] Goldstein conceded that the Manufacturing Agreement did not by its terms permit FHK to make CO detectors for anyone other than Quantum and that it had never been amended in

6

He stated that the royalties FHK paid for the detectors that it was selling to Fyrnetics was the same 2.5% royalty provided for in the License Agreement. Goldstein testified he understood these royalties were paid pursuant to the License Agreement; he said there was no basis other than that Agreement permitting FHK, Fyrnetics, or Kidde to use Quantum's proprietary technology to make CO detectors for anyone other than Quantum.

Goldstein agreed there was nothing in writing from Fyrnetics stating that FHK was making licensed products for Fyrnetics under the License Agreement; he never saw any documents under which Fyrnetics sublicensed FHK or anyone else. He likewise conceded that the License Agreement was never amended to make FHK a party and that he had no conversations in which it was discussed that FHK would be bound by the License Agreement.

Goldstein said that he understood that both the License Agreement and the Manufacturing Agreement were transferred to Kidde in connection with the sale of the stock of FHK and Fyrnetics. He maintained that both parties understood and agreed that no formal written assignment of the agreements was needed because what was happening was simply a change of ownership; it was mutually understood that both Agreements would remain in effect after the sale of FHK's and Fyrnetics' stock.

**D. Conclusions**

The Court concludes that the Manufacturing Agreement and its arbitration provision do not apply to the present dispute. Though the Agreement is between two of the parties to this litigation – FHK and Quantum – it concerned FHK's manufacture of CO detectors *for sale by*

---

writing to provide for FHK to make CO detectors for anyone else.

7

*Quantum*. The present dispute arises not from FHK's manufacture of CO detectors for Quantum, but from FHK's manufacture of CO detectors for its own account.

Plaintiffs argue that the License Agreement likewise has nothing to do with this dispute. They say, and Russo initially testified, that Fyrnetics never purchased any CO sensors from Quantum. But this is not entirely correct. In the late spring of 1997, Fyrnetics in fact placed orders for CO sensors and other components of the CO detectors that FHK was making for Fyrnetics. Though plaintiffs contend that this was a mistake, at a minimum it is indicative that the plaintiffs' and Fyrnetics' dealings with Quantum cannot be so neatly divided into separate parts as plaintiffs contend.

Plaintiffs contend that FHK's purchase of CO sensors to be used in CO detectors that FHK was selling for its own account was not done pursuant to either the License Agreement or the Manufacturing Agreement, but rather was pursuant to what amounts to a verbal agreement entered into between FHK, through Russo, and Quantum, through Goldstein. The Court rejects this argument.

The Court does not doubt Russo's testimony concerning his 1996 conversations with Goldstein, but the real question is whether the parties understood they were acting pursuant to a verbal agreement (as Russo claims) or one or both of the written agreements (as Goldstein claims). Even though Russo testified, and the plaintiffs maintain, that the License Agreement was a dead letter, documents confirm that Fyrnetics/Kidde was treating the Agreement as alive and well as late as June 1997. And the fact that the royalty rate paid for the detectors that FHK sold to Fyrnetics/Kidde was the same percentage amount set forth in the License Agreement further supports the proposition that the parties were acting pursuant to that Agreement.

8

The Court does not believe that Quantum would have agreed to allow its proprietary technology to be used pursuant to anything other than a written agreement; it makes no sense that Quantum would have required detailed written agreements in its other dealings with FHK and Fyrnetics but would have operated entirely under a verbal agreement here. The evidence is clear, and the Court finds, that Quantum believed that FHK was making the CO detectors it sold to Fyrnetics/Kidde pursuant to the License Agreement. The Court likewise finds that Fyrnetics/Kidde and FHK understood that they were acting pursuant to the License Agreement, whether or not this was actually voiced by anyone.

The License Agreement permitted Fyrnetics to sublicense any affiliate; the Agreement passed to Fyrnetics/Kidde as part of the Kidde acquisition. FHK was clearly an affiliate of Fyrnetics/Kidde as the Agreement defines that term; both were owned by Williams PLC subsidiaries. And though plaintiffs point out that there was no written sublicense, nothing in the License Agreement required a sublicense to be in writing. Thus even if Russo and Goldstein had a verbal agreement, the Court finds and concludes that it was an understanding that FHK would and could act as Fyrnetics' sublicensee.

There is no indication that Fyrnetics/Kidde entered into a written nondisclosure agreement with FHK, as would have been required under License Agreement for a subcontractor, but again that does not mean the activity was not being done pursuant to the License Agreement. Rather, it means only that Fyrnetics/Kidde may not have been in strict compliance with its obligations under that Agreement. It is likely that all concerned simply assumed that as a sister (or at least a first cousin) of Fyrnetics/Kidde, and as a company with its own nondisclosure obligation under the Manufacturing Agreement, *see* Mfg. Agr. ¶17, FHK did not need to have

9

another separate nondisclosure agreement.

In sum, the Court concludes that in purchasing the CO sensors and other components from Quantum for use in the CO detectors sold to Fyrnetics and Kidde, FHK was acting as Fyrnetics' sublicensee under the License Agreement.[2]

For the foregoing reasons, the Court grants defendant's motion to dismiss or stay pending arbitration. The Court assumes that Quantum will pursue arbitration. Under the License Agreement, arbitration must take place in San Diego, California if initiated by Quantum. Confirmation of the award will take place, if at all, in a state or federal court in San Diego. *See* 9 U.S.C. §9; Lic. Agr., ¶III.K.(15). Thus rather than staying this action pending completion of the arbitration, the Court hereby dismisses plaintiffs' complaint.

MATTHEW F. KENNELLY
United States District Judge

Date: August 7, 2000

---

[2] The Court could just as easily conclude that Fyrnetics/Kidde made FHK a subcontractor under the License Agreement. Either way, the result is the same; the sensors and other components were purchased pursuant to the License Agreement.

10