# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4704 | **DATE** | 1/14/2003 |
| **CASE TITLE** | | Fyrnetics Limited vs. Quantum Group | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants defendant's renewed motion to dismiss or stay pending arbitration (60-1, 60-2, 61-1, 61-2). The case is dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 2 3 2003 | |
| | Notified counsel by telephone. | | date docketed | 67 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| | OR / courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
JAN 2 3 2003

FYRNETICS (HONG KONG) LIMITED )
and WALTER KIDDE PORTABLE )
EQUIPMENT, INC., )
)
Plaintiffs, )
)
vs. ) Case No. 99 C 4704
)
QUANTUM GROUP, INC., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Following an evidentiary hearing, the Court previously ruled that the present dispute is subject to a contractual mandatory arbitration provision. *Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, No. 99 C 4704, 2000 WL 1139907 (N.D. Ill. Aug. 10, 2000). After the Court denied plaintiffs' motion for reconsideration, *Fyrnetics (Hong Kong) Ltd., v. Quantum Group, Inc.*, No. 99 C 4704, 2001 WL 40900 (N.D. Ill. Jan. 11, 2001), plaintiffs appealed. The Seventh Circuit affirmed on all issues but one and remanded the case with instructions to examine further the issue whether plaintiff Fyrnetics (Hong Kong) Limited (FHK) is bound by the arbitration provision. *Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023 (7th Cir. 2002). For the reasons stated below, we conclude that FHK must arbitrate its claims against the defendant.

### BACKGROUND

Familiarity with the Court's previous rulings is presumed. The Court reviews the facts



only as necessary to provide context for the present ruling.

Defendant Quantum Group, Inc. (Quantum) is a California based corporation that manufactures a patented carbon monoxide (CO) sensor for use in CO detectors. In June 1996, Quantum entered a license agreement with Fyrnetics, Inc. (Fyrnetics), an Illinois corporation.[1] In the agreement, Quantum granted Fyrnetics a nonexclusive licence to make and sell for its own account CO detectors equipped with Quantum's CO sensors. In return, Fyrnetics agreed to pay Quantum royalties consisting of 2.5% of Fyrnetics's gross sales of CO detectors. The agreement permitted Fyrnetics to sublicense its affiliates, Lic. Agr. ¶ I.A.(2), defined as entities that controlled or were controlled by Fyrnetics or had ownership common to Fyrnetics, *id.* p. 3. Any such sublicensee would be bound by the terms of the license agreement, *id.* ¶ I.A.(2), and there was no requirement that a sublicense be in writing. The license agreement also contained a provision requiring arbitration of "[a]ny claim or controversy arising between the parties hereto in connection with this Agreement, or with a claimed breach thereof." *Id.* ¶ III.H.

The present dispute arises from FHK's purchase of CO sensors from Quantum. FHK installed the sensors into CO detectors that it manufactured and sold to Fyrnetics. Fyrnetics then sold the detectors under its own brand, Lifesaver. Some of the sensors allegedly failed, causing the CO detectors to malfunction. As a result, plaintiffs recalled approximately 450,000 detectors, at a cost of over $14 million. Plaintiffs sued Quantum, alleging misrepresentation, negligence, and breach of warranty. Quantum moved to dismiss the complaint or stay the proceedings in

---

[1] In January 1997, plaintiff Walter Kidde Portable Equipment, Inc. (Kidde) purchased Fyrnetics's stock, and in June 1998, Kidde caused Fyrnetics to be merged into Kidde. As a result, Fyrnetics was formally dissolved and no longer exists as a corporate entity. Kidde's claims against Quantum, however, are derivative of those Fyrnetics would have had.

favor of arbitration. The Court granted defendant's motion and dismissed plaintiffs' complaint.

The Court found that the parties understood that Quantum sold the CO sensors to FHK pursuant to the license agreement and that plaintiffs were therefore bound to arbitrate their claims. The Court also found that FHK, as an affiliate of Fyrnetics, was acting as a sublicensee under the license agreement.[2] In so finding, the Court rejected as lacking in credibility the testimony of Thomas Russo, the president and CEO of Fyrnetics and the managing director of FHK, that the parties were acting pursuant to a purported oral agreement between FHK and Quantum.

The Seventh Circuit affirmed the Court's finding that no oral agreement existed, *Fyrnetics*, 293 F.3d at 1028, but found that the Court had bound FHK to the license agreement solely by virtue of an erroneous factual determination – FHK's payment of royalties to Quantum in the percentage specified in the license agreement, *id.* at 1029. The Seventh Circuit found the record devoid of evidence that FHK had paid any royalties to Quantum, stating that the evidence showed that Fyrnetics and then Kidde, but not FHK, paid the royalties. The court therefore remanded on the issue whether FHK, as a nonsignatory of the license agreement, was nevertheless bound by it and instructed the Court to reexamine the issue further. *Id.* ("Through further findings, FHK might prove to have assumed the license agreement or prove to be bound through . . . [an] alternative theor[y] for binding a non-signatory.").

## DISCUSSION

Arbitration is contractual by nature. Therefore "a party cannot be required to submit to

---

[2] The Court also found, and the Seventh Circuit affirmed, that Kidde, although also a nonsignatory to the license agreement, was bound to the arbitration provision as Fyrnetics's successor.

3

arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). "It does not follow, however, that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960). As the Seventh Circuit stated, "there are several ways that a non-signatory can be bound by a contract, such as through the doctrines of assumption, agency, equitable estoppel, veil piercing, and incorporation by reference." *Fyrnetics*, 293 F.3d at 1029 (citing *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)). Quantum maintains that principles of assumption, equitable estoppel, and agency dictate that FHK must arbitrate its claims.

Having found, and the Seventh Circuit having affirmed, that no oral agreement existed between FHK and Quantum, we are left with two possibilities: the parties were acting pursuant to either the license agreement or no agreement at all. Based on the evidence before the Court and the reasonable inferences that may be drawn from it, we find that the parties were acting pursuant to the license agreement.

### A. Assumption

In the absence of a signature, a party can be bound by an agreement's arbitration provision if that party's conduct "manifest[s] an intention to be bound by that [a]greement." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995). The Court finds that FHK assumed the license agreement by becoming a sublicensee of Fyrnetics.[3] As an initial

---

[3] The Court previously found, and the Seventh Circuit affirmed, that FHK was Fyrnetics's affiliate as the term is defined in the license agreement.

matter, almost $195,000 in royalties were paid to Quantum – reflecting the amount provided by the license agreement. Hearing Tr. at 41 (Goldstein direct); Def.'s Ex. 6. The obligation to pay royalties arose from nothing other than the license agreement. The bare bones purchase orders and invoices that FHK argues governed the exchanges say nothing about royalty payments, nor would one expect them to do so. Pl.'s Mem. in Opposition to Def.'s Renewed Mot. to Dismiss or Stay at 7; Pls.' Ex. F (invoices); Pls.' Ex. 8 ("representative sample" of purchase order); Def.'s Ex. 25 (purchase orders). As Fyrnetics itself never manufactured any detectors pursuant to the license agreement, Hearing Tr. at 127 (Russo direct), royalties would be due only if someone else had done so.

On appeal, FHK argued that there was no evidence that FHK itself ever paid any royalties. Yet the terms of the license agreement reveal that this is not surprising and not indicative that FHK was not a sublicensee:

> Each Affiliate so sublicensed shall be bound by the terms and conditions of this Agreement as if it were named herein in the place of Licensee, *provided that Licensee shall pay and account to Quantum for royalties hereunder in respect of the exercise by any Affiliate of any sublicense granted to it hereunder.*

Lic. Agr. ¶ I.A.(2) (emphasis added). In other words, the payment of royalties was one obligation under the license agreement that Fyrnetics could not assign; Fyrnetics remained responsible to pay royalties in the event of a sublicense arrangement.

The fact that Fyrnetics, and not FHK, paid royalties to Quantum thus does not support FHK's argument that it did not assume the license agreement. Rather, Fyrnetics's payment of royalties – of which there is ample evidence – is consistent with, and evidence of, its sublicensing of FHK. That Fyrnetics paid any royalties to Quantum based on detectors it

5

purchased from FHK demonstrates that all concerned understood that they were acting pursuant to the licence agreement. And if Fyrnetics – through Russo – knew that it was obligated to pay royalties based on detectors manufactured by FHK, then FHK – also through Russo – had to know that it was operating under the licensing agreement.

But the strongest evidence that FHK assumed the agreement as a sublicensee is the very fact that FHK manufactured and sold for its own account CO detectors that incorporated Quantum sensors. This is something that only Fyrnetics, by way of the license agreement, had been granted permission to do. Were it not for the sublicense provision of the license agreement, there would have been no legal basis for FHK to equip its detectors with Quantum sensors and then sell them to Fyrnetics in the first place. Thus it was only by way of the license agreement that FHK could manufacture the detectors for its own account.

One might argue that FHK was simply buying sensors from Quantum and that no special agreement was necessary for FHK to incorporate Quantum sensors into detectors FHK sold for its own account. But this argument is both illogical and implausible in light of the evidence.

Quantum's president, Mark Goldstein, testified at the hearing that he believed FHK was manufacturing the sensors pursuant to the license agreement and that there was no other basis for FHK to use Quantum's proprietary technology to make CO detectors for its own account. His testimony was both credible and consistent with the evidence. It would make no sense for Quantum, which was so cautious with its proprietary technology as to require a detailed, eighteen-page license agreement from Fyrnetics, to turn around and sell its sensors to FHK with no strings attached. And it defies reason to suggest that a sophisticated player like FHK could have so little business savvy as to believe otherwise.

Additionally, the evidence established that Quantum had eight other licenses outstanding. Hearing Tr. at 45 (Goldstein direct). Based on Goldstein's testimony, it likely would have violated Quantum's agreement with the other licensees to permit FHK to make and sell detectors for its own account without a license agreement to dictate the terms, especially the royalty percentage. *See id.* at 44-45. Russo was well aware of these arrangements, including Quantum's "most favored nation" agreement with another company. Hearing Tr. at 134 (Russo direct).

FHK contends that had it assumed the license agreement, it would have complied with certain other responsibilities under the agreement, such as filing monthly reports and providing accounting records. FHK states that it never did any of these things and that its conduct therefore belies its assumption of the agreement. Pl.'s Mem. in Opposition to Def.'s Renewed Mot. to Dismiss or Stay at 7. The Court disagrees. These omissions indicate nothing more than that FHK may not have been in strict compliance with its obligations under the agreement.

**B.    Estoppel**

"A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping*, 170 F.3d at 353. By manufacturing and selling the CO detectors for its own account, FHK received the principal direct benefit of the license agreement – the ability to produce and sell for profit CO detectors containing Quantum sensors. As discussed above, without the license agreement – and the sublicense provision contained in it – FHK would not have been able to manufacture CO detectors for its own account that it could then sell to Fyrnetics.

Russo negotiated and signed the license agreement with Quantum. Hearing Tr. at 125 (Russo direct), 149 (Russo cross). FHK, through Russo, therefore had knowledge of the

7

agreement's arbitration provision. By exploiting the license agreement and accepting its benefits with knowledge of the arbitration clause, FHK is estopped from denying its obligation to arbitrate. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993); *see also Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) ("To allow [plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." (quoting *Avila Group, Inc. v. Norma J. of Cal.*, 426 F. Supp. 537, 540 (S.D.N.Y. 1977) (internal quotation marks omitted))).

FHK argues that a finding that it is bound by the license agreement would "render[] . . . meaningless" its issuance of purchase orders to Quantum and Quantum's submission of invoices and would be "patently inconsistent" with these actions. Pl.'s Mem. in Opposition to Def.'s Renewed Mot. to Dismiss or Stay at at 10. This argument is entirely without merit. The license agreement itself states that "Licensee shall issue purchase orders to Quantum for sensors," and as recited above, the sublicense clause states that any affiliate sublicensee would be bound to the agreement "as if it were named . . . in the place of Licensee." Lic. Agr. ¶¶ G.(1), I.A.(2). Thus the fact that FHK issued purchase orders that were honored is in no way inconsistent with sublicensee status.

## C. Agency

Quantum argues alternatively that FHK should be bound to the license agreement by virtue of the doctrine of apparent agency. Quantum maintains that FHK acted as Fyrnetics's apparent agent. However, as FHK points out in its reply brief, even if FHK were Fyrnetics's agent, a principal cannot bind its agent.

8

## CONCLUSION

For the reasons stated above, the Court grants defendant's renewed motion to dismiss or stay pending arbitration [docket nos. 60-1, 60-2, 61-1, 61-2]. The case is hereby dismissed.

MATTHEW F. KENNELLY
United States District Judge

Date: January 14, 2003